# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **JERRY LEE DUNHAM,** )<br>)<br>)<br>**Plaintiff,** )<br>)<br>v. )<br>)<br>**MICHAEL J. ASTRUE, Commissioner,** )<br>**Social Security Administration,** )<br>)<br>**Defendant.** ) | Case No. 09-CV-773-PJC |

## **OPINION AND ORDER**

Claimant, Jerry Lee Dunham ("Dunham"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying claimant's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that claimant was not disabled. For the reasons discussed below, the Court REVERSES AND REMANDS the Commissioner's decision.

### **Claimant's Background**

Dunham was born on August 25, 1954, and was 52 years old at the time of the ALJ's decision. (R. 32, 77). He has a high school education. (R. 33). Dunham worked as a spray painter. (R. 34, 106). Dunham alleges an inability to work beginning January 24, 2005, due to degenerative disease in his right knee and ambulatory impairment from a left knee replacement. (R. 31-32), He also suffers from obesity. (R. 33).

Dunham has had a long history of knee problems. He began seeing Ron Hood, M.D., for his knee problems in 2001. (R. 182). At that point, he had already undergone three surgeries on his right knee. *Id.* Dr. Hood treated the knee with Hyalgan injections from August 2001 through September 2001, with good results. (R. 182-84). On November 19, 2002, Dunham presented with a re-injury of his right knee and pain and tenderness in the medial aspect of his knee where primary degenerative arthritis had been present at his last evaluation. (R. 184). Dr. Hood again began a series of Hyalgan injections from November 2002 through February 2003. (R. 184-87). When Dunham did not obtain significant relief from the injections for his right knee degenerative joint disease, Dunham underwent right knee arthroscopy for an osteochondral allograft to the medial femoral condyle. (R. 169-70, 188-91). After undergoing a course of physical therapy, Dunham was finally released from medical care and to return to full duty on July 29, 2003. (R. 191). In August, 2003, Dr. Hood rated Dunham with a 4% permanent partial disability to the whole person or 10% to his lower extremity. (R. 192).

In April 2004, Dunham returned to Dr. Hood complaining of pain and tenderness in his left knee. (R. 193). A MRI revealed medial and lateral meniscal tears with extensive loss of femoral articular cartilage. (R. 166, 251). Dr. Hood performed a left knee lateral meniscectomy chondroplasty and partial medial meniscectomy on May 6, 2004. (R. 168, 195). Repair of his left knee did not progress as well as the right knee and he underwent another meniscectomy chondroplasty on July 28, 2004 (R. 167, 200). After several months of physical therapy, Dunham was released to return to work in November 2004 with a "significant disability in his knees" which Dr. Hood believed "will continue to worsen, placing him at higher risk for repeat injury." (R. 202). Dr. Hood noted that "[v]ocational reassessment can be of benefit particularly

2

since the patient does face a high risk of reinjury and may not be successful in long term return to his employment." *Id*. In a follow-up visit on November 23, 2004, Dunham reported that he wanted to be considered for total knee arthroplasty as he did not want to have to continue to use narcotics to manage his normal job activities. (R. 204).

On January 24, 2005, Dunham returned to Dr. Hood complaining of continued pain in his left knee to the point that his right knee was buckling and giving way. (R. 205). Dr. Hood opined that conservative treatment would no longer be an option and that a total knee arthroplasty with permanent restrictions and change of occupation would likely be necessary. (R. 205, 208) On February 17, 2005, Dr. Hood performed a left total knee replacement. (R. 174, 209). After several months of physical therapy and healing of a stitch abscess, Dr. Hood noted on May 16, 2005, that Dunham had not made "any significant gains" as he still had "warmth in his knee and tenderness." (R. 209-17, 239-46). Dr. Hood recommended that Dunham be placed on "permanent restrictions of no squatting, kneeling, crawling or climbing." (R. 217, 220-21).

On October 16, 2006, Dunham saw Dr. Hood complaining primarily of pain and tenderness in his right knee. (R. 255). Dr. Hood noted that Dunham had "bone-on-bone in the medial compartment of the [right] knee with crepitus at the patellofemoral joint" and use of his left knee was "significantly impaired in his ambulatory ability." *Id*. Dr. Hood opined that the "severe degenerative change in the right knee ultimately will culminate in total knee arthroplasty." *Id*. Based on Dunham's knee problems, Dr. Hood authorized a handicap permit indicating that Dunham could not walk without an assistive device and further opined that Dunham "will continue to have permanent restrictions in his squatting, kneeling and crawling

which will make it very difficult for him to find employment and I believe he should be evaluated for social security disability." (R. 158-59, 255, 257).

On March 7, 2007, Dr. Hood completed a medical source opinion of Dunham's RFC stating that Dunham could stand/walk infrequently, *i.e.*, 0-1 hours in a eight-hour work day due to degenerative joint disease of the knees. (R. 248).

On May 11, 2007, Dunham was seen by Thomas A. Marberry, M.D., for increased pain and tenderness in his right knee. Dr. Marberry noted that there was a 1-2+ effusion, the patella was not ballottable and x-rays showed a collapse of the medial compartment of the right knee. (R. 250). Dr. Marberry recommended conservative treatment as long as possible but opined that a total right knee replacement would ultimately be necessary. He reiterated Dunham's permanent restrictions in "squatting, kneeling, crawling, climbing and lifting." *Id*.

On October 20, 2007, in response to a request for clarification regarding Dunham's ability to walk or stand on May 16, 2005 and again on October 16, 2005 when Dr. Hood opined that Dunham had permanent restrictions of no squatting, kneeling, crawling, or climbing, Dr. Hood opined that Dunham would only be able to stand or walk 4 out of 8 hours per day. (R. 259).

An agency non-examining medical consultant, Luther Woodcock, M.D., completed a RFC assessment from Dunham's medical records on March 1, 2006. Based on the record before him, Dr. Woodcock opined that Dunham could life twenty pounds occasionally and ten pounds frequently, could sit about six hours in an eight hour day, could stand and/or walk about six hours in an eight hour day, and could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 225-231). Despite the contradictions between his RFC and Dr. Hood's, Dr.

4

Woodcock stated that he had considered Dr. Hood's statement on 7/22/05 that Dunham "is released with permanent restrictions of no squatting, climbing, kneeling or crawling" and his assessment of Dunham's restrictions was not significantly different from Dr. Hood's. (R. 231).

Dunham testified that he experienced pain and tenderness in both knees. Even after knee replacement, his left knee was still tender and would get stiff if he were on it very long. (R. 36). He also had problems with his right knee after injuring it in 1989 and it buckled and gave out often, sometimes 2-3 times a day. (R. 36-38, 114, 148). Although he could do some household chores like dishwashing and laundry, preparing quick meals, and vacuuming, he could only do them for short periods of time before needing to sit down. (R. 41-42, 49-51). He was able to stand for about 30 minutes and walk maybe "an hour, hour and a half." (R. 44). He was able to drive and went to the drive-in teller at the bank as well as the post office. (R. 41). When he went shopping, he would have to lean on the buggy for support and sit down while his wife paid. (R. 42, 50). His only hobby was watching his daughter's softball games. (R. 42-43).

## Procedural History

On November 9, 2005, Dunham protectively applied for disability benefits under Title II (42 U.S.C. § 401 et seq.), and for Supplemental Security Income benefits under Title XVI (42 U.S.C. § 1381 et seq.). Claimant's application for benefits was denied in its entirety initially and on reconsideration. (R. 58-59). A hearing before ALJ Charles Headrick was held on May 21, 2007, in Tulsa, Oklahoma. (R. 28-57). By decision dated August 14, 2007, the ALJ found that claimant was not disabled at any time through the date of the decision. (R. 15-24). On October 15, 2009, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision

5

of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §423(d)(1)(A). A claimant is disabled under the Act only "if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920. [1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.972. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. §§ 404.1520, 416.920.

Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002) (citation omitted). In reviewing the decision of the Commissioner, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Id.* (citation omitted). Nevertheless, the court examines "the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis, determine[s] if the substantiality of the evidence test has been met." *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991).

### Decision of the Administrative Law Judge

The ALJ made his decision at the fifth step of the sequential evaluation process. He found that Dunham had the residual functional capacity ("RFC") to perform light work with the additional restrictions of no squatting, climbing, kneeling or crawling. (R. 18). The ALJ determined that claimant could not perform his past relevant work, but there were other jobs existing in significant numbers in the national and regional economies that he could perform, based on his RFC, age, education, and work experience, specifically laundry sorter, video rental clerk, laborer or mailer, and order clerk. (R. 22-24). The ALJ concluded that he was not disabled under the Social Security Act at any time through the date of the decision. (R. 25).

### Review

Dunham asserts as error that (1) the ALJ failed to properly consider the treating physician's opinions; (2) The ALJ's credibility finding is not supported by substantial evidence; and (3) the RFC assessment is not supported by substantial evidence.

A treating physician may offer an opinion that reflects a judgment about the nature and severity of the claimant's impairments, including the claimant's symptoms, diagnosis and prognosis, what the claimant can do despite his or her impairment, and any physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A treating physician's opinion must be given substantial weight unless good cause is shown to disregard it. *Goatcher v. U.S. Dept. of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995). In addition, without supporting evidence to the contrary, the ALJ cannot interpose his own "medical expertise" for that of a physician, especially when that physician is the regular treating doctor." *Kemp v. Bowen,* 816 F.2d 1469, 1476 (10th Cir. 1987). The Commissioner will give controlling weight to such an opinion if it is well-supported by clinical and laboratory diagnostic techniques and if it is consistent with other substantial evidence in the record. *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around. *Reyes v. Brown*, 845 F.2d 242, 245 (10th Cir. 1988). Reports of physicians who have treated a patient over a period of time are given greater weight than reports of physicians employed or paid by the government for the purpose of defending against a disability claim. *Frey v. Brown*, 816 F.2d 508, 513 (10th Cir. 1987); *Broadbent v. Harris*, 698 F.2d 407, 412 (10th Cir. 1983).

Dunham argues that the ALJ's finding that Dunham could do light work is a rejection of his treating physician Dr. Hood's opinion; yet the ALJ failed to give any explanation for its rejection. The Court agrees.

8

Although the ALJ acknowledged that Dr. Hood "placed the claimant on permanent restrictions of 'no squatting, kneeling, crawling or climbing,'" that it was "Dr. Hood's opinion that the claimant would not be able to return to full duty without risking significant exacerbation of his knee pain and swelling," and that Dunham would only be able to stand and/or walk for up to one hour in an 8-hour day due to degenerative joint disease of the knee, the ALJ nonetheless found that

> the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or has limitations greater than those determined in this decision. It is emphasized that the restrictions indicated by the claimant's treating physician are consistent with those determined in this decision

(R. 20, 22).

The restrictions identified by Dr. Hood are clearly not consistent with the ALJ's RFC finding that Dunham can perform light work as long as there is no squatting, climbing, kneeling or crawling. Light work is defined under the regulations as work that "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §404.1567. As the ALJ noted, Dr. Hood in his March 7, 2007 Medical Source Opinion of Residual Functional Capacity opined that Dunham would only be able to stand and/or walk up to one hour in a eight-hour day to his degenerative joint disease of the knees. Thus, Dr. Hood's opinion clearly contradicts the ALJ's RFC.

The Commissioner argues that the ALJ nonetheless offered reasons for rejecting Dr. Hood's opinion when he followed the recitation of Dr. Hood's opinion stating that "[n]o further explanations were provided," and when he cited Dr. Hood's November 20, 2006 that Dunham had "overall markedly improved." (R. 21). If these are the ALJ's reasons for rejecting Dr. Hood's opinion, he has failed to show that Dr. Hood's opinion is not well-supported by clinical

9

and laboratory diagnostic techniques and is inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215.

The record is replete with evidence of Dunham's significant degenerative joint disease of his knees that supports Dr. Hood's opinion. Dunham has a long history of knee problems and has undergone multiple surgeries on both knees. After conservative treatment and then Hyalgan injections were no longer effective on his right knee, Dunham was ultimately forced to undergo a right knee arthroscopy, chondroplasty of the patellofemoral joint and an osteochondral allograft transfer to the medial femoral condyle. Subsequent degenerative joint disease in his left knee required a total left knee replacement that still failed to alleviate pain, tenderness and stiffness. Further, as the ALJ noted, by the date of the hearing, x-rays "showed collapse of the medial compartment of the right knee." (R. 21). Due to this "bone-on-bone in the medial compartment of the [right] knee with crepitus at the patellofemoral joint," Dr. Hood opined that the "severe degenerative change in the right knee ultimately will culminate in total knee arthroplasty." This opinion was shared by Dr. Marberry on May 11, 2007. And finally, based on Dunham's knee problems, Dr. Hood authorized a handicap permit indicating that Dunham could not walk without an assistive device. In sum, Dr. Hood's opinion is well-supported by the clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record.

The Commissioner cites as additional support of the ALJ's RFC assessment that "[i]nterestingly, when Dr. Hood placed restrictions on Plaintiff's ability to kneel, squat, climb, or stoop, he conspicuously did not check the boxes limiting Plaintiff's ability to stand or walk," citing Dr. Hood's October 16, 2006 statement of restrictions. *Response*, p. 7. However, any inference that this failure may lend to the Commissioner's reading of Dr. Hood's restrictions is

negated by Dr. Hood's supplement to the record before the Appeals Council. In that supplement, Dr. Hood states that his May 16, 2005 and October 16, 2006 statements of restrictions were not meant to exclude restrictions on standing/walking and that Dunham could stand/walk only four out of eight hours as of those dates. Again, the treating source's opinions contradict that of the ALJ's RFC.

Thus, contrary to the ALJ's position, the Court finds that the ALJ failed to properly consider Dr. Hood's opinions and there is substantial evidence in the record that Dunham's limitations from his degenerative joint disease of his knees "are greater than those determined in [the ALJ's] decision." (R. 22).

## Conclusion

For the reasons stated above, the Court REVERSES AND REMANDS this case for further review.

IT IS SO ORDERED, this 28th day of March, 2011.

_____
Paul J. Cleary
United States Magistrate Judge